IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

EDWIN ESTEBAN FLORES and
JUAN CARLOS CARRENO-
ROMERO,

        Defendants.

CRIMINAL ACTION FILE

NO. 1:19-CR-364-MHC-JSA

## ORDER

This action comes before the Court on the Final Report and

Recommendation ("R&R") of Magistrate Judge Justin S. Anand [Doc. 157]

recommending that the following motions be denied:  (1) Defendant Edwin

Esteban Flores ("Flores")'s Motions to Suppress Evidence [Docs. 105, 107], and

Motion to Suppress Identification [Doc. 109], and (2) Defendant Juan Carlos

Carreno ("Carreno")'s Motions to Suppress Evidence [Docs. 59, 84, 90, 97, 112],

and Motion to Suppress Identification Testimony [Doc. 98].  The Order for Service

of the R&R [Doc. 158] provided notice that, in accordance with 28 U.S.C.

§ 636(b)(1), the parties were authorized to file objections within fourteen (14) days

of the receipt of that Order.  After receiving an extension of time to file their

objections [Doc. 165], Flores and Carreno filed their objections to the R&R [Docs. 163, 164]] ("Flores's Objs." and "Carreno's Objs.").

## I.   LEGAL STANDARD

In reviewing a Magistrate Judge's R&R, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to.  Frivolous, conclusive, or general objections need not be considered by the district court."  United States v. Schultz, 565 F.3d 1353, 1361 (11th Cir. 2009) (quoting Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988)).  If there are no specific objections to factual findings made by the Magistrate Judge, there is no requirement that those findings be reviewed *de novo*.  Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993) (citations omitted).  Absent objection, the district court judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge," 28 U.S.C. § 636(b)(1), and may accept the recommendation if it is not clearly erroneous or contrary to the law.  FED. R. CRIM. P. 59(a).  In accordance with 28 U.S.C. § 636(b)(1) and Rule 59 of the Federal Rules of Criminal Procedure, the Court has conducted a *de novo* review of those portions of the R&R

2

to which Defendants object and has reviewed the remainder of the R&R for plain

error.  See United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

## II.    DISCUSSION

### A.    Background

In January 2019, an ongoing narcotics investigation was being conducted by

agents of the Drug Enforcement Administration ("DEA"), including DEA Special

Agent Raymond Devogt ("Devogt").  Appl. and Aff. for Search Warrant for 1917

Bramlet Court, Tucker, Georgia ("SW I") [Doc. 119] at 8; Sept. 15, 2020, Tr. of

Evidentiary Hr'g ("Tr.") [Doc. 133] at 6-7.  On January 25, 2019, a passenger

vehicle was stopped and officers found and seized one kilogram of heroin and 4.5

kilograms of cocaine in a metal cylinder.  SW I at 8; Tr. 8.  The passenger of the

vehicle ("HM") was arrested and agreed to speak with officers and review text

messages on his cell phone.  SW I at 8.  The address 1917 Bramlet Court (the

"Residence") was referenced in some messages, and HM admitted to delivering

metal cylinders to that address one week earlier.  Id.; Tr. 8.  Between January 25,

2019, and April of 2019, DEA agents conducted surveillance on the Residence and

noticed "multiple adults along with multiple children at the house" and a "a white

van . . . that was parked at the house several times."  Tr. 9.

Meanwhile, in April 2019, undercover agents in Raleigh, North Carolina conducted an investigation into a drug trafficking operation which was responsible for the shipment of narcotics from Mexico to Atlanta for subsequent distribution in Raleigh. SW I at 9; Tr. 7. After arranging for the purchase of methamphetamine in Raleigh and effectuating the seller's arrest on April 23, 2019, the seller ("JP") agreed to speak with agents. SW I at 9-10; Tr. 7. JP admitted to picking up the drugs from the Residence (which he stated was a place where illegal drugs were stored) earlier that day, leaving his vehicle at the Residence, and driving another vehicle provided to him to take the drugs to Raleigh. SW I at 9-10; Tr. 7. JP also provided agents with a photograph of Flores. Tr. 16, 20. Agents went to the Residence and confirmed that JP's vehicle was parked in front of the property. SW I at 10.

On April 23, 2019, DEA agents obtained a search warrant for the Residence which authorized the seizure of narcotics, financial and other records relating to drug trafficking, wireless communication devices (including cellular telephones) and firearms or other dangerous weapons. SW I at 14-16; TR. 9. The search warrant was executed at the Residence on April 25, 2019, and Devogt testified as follows at the evidentiary hearing:

> **Q.** And can you take me through what you found at the house and how that execution went forward?

4

**A.** During the execution of the search warrant, we went inside, inside the master bedroom. There was a methamphetamine conversion lab in which they were converting liquid methamphetamine and crystal methamphetamine. There was a kilo press in the master bedroom and master bath. There was also a screening station used to separate the crystal from the liquid methamphetamine. There were several canisters or metal tins of acetone, which is used in the methamphetamine-making process or the conversion process. There was also bank records found for Mr. Edwin [Flores] downstairs in what used to be the living room, or I'm sorry not the living room, it used to be the dining room area that was converted to a bedroom. And then there was a safe that contained cocaine, heroin and a pistol, sir.

**Q.** And where was the safe?

**A.** The safe was in the master bedroom.

**Q.** Did you seize any drugs during the search warrant?

**A.** Yes, we seized approximately -- well, I think it was 12 kilos of methamphetamine total, and then there was -- we took samples of liquid methamphetamine that was still in the house.

Tr. 9-10.

The only person inside the Residence during the execution of the search warrant was a nine-year-old child. Tr. 11. Through school records, the agents determined that co-Defendant Francheska Terrero ("Terrero") was the child's mother, and that the only other person who was allowed to pick up the child was JP. Id. at 11-12. Agents then spoke with Terrero's sister, who stated that Terrero had been "involved with drugs for approximately one year," had been living at the

Residence, and recently had a new boyfriend. Id. at 12.  An agent then called

Terrero posing as a Department of Family and Childrens Services ("DFACS")

worker, and said he needed to talk about her son, set up a time for a meeting at the

local DFACS office, and an arrest warrant was then obtained for Terrero for

manufacturing methamphetamine and for having children in the meth lab. Id. at

13, 66.

When Terrero arrived at the DFACS office, she was a passenger in a white

van driven by Carreno that matched the description of the vehicle seen at the

Residence during surveillance. Id. at 13, 66-67.  Terrero got out of the vehicle and

proceeded into the DFACS office. Id. at 75.  Because officers assumed that the

driver of the white van could have been Terrero's "new boyfriend" and a vehicle

matching the description of the white van was observed at the Residence, a

decision was made to detain the driver. Id. at 67-68.  DEA Task Force Officer

George Smith ("Smith"), who participated in the search of the Residence, went to

the passenger side of the white van where the window was open with his gun

drawn and instructed the driver, later identified as Carreno, to show his hands

while another officer pulled a car in front of the vehicle to block Carreno from

driving off. Id. at 68-69, 72-73.  Through the open window, one or more of the

officers observed a glass pipe in the console area next to a beer bottle that in

Smith's experience appeared to be used for smoking methamphetamine or crack cocaine as opposed to tobacco. Id. at 68-71; Gov't Ex. 5. There also were children in the back seat. Tr. 70. After Carreno was secured, a search of the vehicle revealed a second glass pipe and a cigarette pouch containing suspected methamphetamine or heroin. Id. at 71-73.

On May 8, 2019, Devogt interviewed JP in Raleigh, and JP stated that he was the personal driver for Elber Flores-Lopez and made previous trips to deliver narcotics during a two to three month period. Id. at 16-17, 21. With respect to the individuals who lived at the Residence, Devogt testified about the information related by JP:

> **Q.** Okay. Did he [JP] also describe the other people who were living in the residence?
>
> **A.** Yes, sir. He stated that there was a female that lived in the master bedroom named Ms. Iveth, later learned to be Nidia Iveth Hernandez. Stated that Mr. Edwin [Flores] lived downstairs, and that there was the kids living right next to the master bedroom that contained the meth lab, and that Mr. Carreno and Ms. Terrero lived in the room right next to that along with Ms. Maria -- I believe you referred to her as Lachina -- in the far right room with the extra storage area.
>
> **Q.** And did he also describe or identify Juan Carlos Carreno?
>
> **A.** Yes.
>
> **Q.** And what he did say about Juan Carlos Carreno?

**A.** That he was the boyfriend of Ms. Terrero, and that they were responsible for traveling to Houston to pick up the liquid methamphetamine and bring it back to the lab.

Id. at 17.  During the May 8, 2019, interview, JP would describe individuals physically and the role they played in the drug trafficking organization, and Devogt would then hand JP photographs of persons for JP to identify.  Id. at 17-19.  JP identified a photograph of Flores during this interview, but that was the photograph that JP himself provided to agents previously in April.  Id. at 19-20.  JP was not shown a photograph of Carreno during this interview.  Id. at 19.

Devogt interviewed JP again on May 30, 2019, and showed him multiple videotapes from a privately-installed security system (referred to as "Night Owl") that was obtained during execution of the search warrant.  Id. at 20.  The videotapes were dated 10-15 days prior to the execution of the search warrant.  Id. at 21.  JP, who had "intimate knowledge of the house and how they were cooking the methamphetamine" as well as "intimate knowledge of everybody in the house," was able to positively identify Flores, Carreno, and Terrero in the videotape as well as other individuals in the Residence.  Id. at 20-25.

On August 8, 2019, Devogt contacted an unidentified female source who was a friend of Flores who would often visit the Residence, and the source was

able to identify Flores and others who were at the Residence and conducted drug

activity:

> She was able to describe everybody who was previously mentioned, where they stayed in the house, their roles. She was able to provide phone numbers for the individuals inside the house. She showed -- she had intimate knowledge of Mr. Elber [Flores-Lopez] and I believe it was Mr. Edwin [Flores]'s mother, stated they had met, they had been friendly. So the -- the source had -- she was friendly with them. She had a lot of information about the drug activity in the house, along with their personal life, sir.

> *****

> She described that Mr. Edwin [Flores] was actively involved in cooking and in the processing of the methamphetamine. The source stated that they would be downstairs boiling the meth in a big, black pot and then they would see Mr. Edwin [Flores] or Mr. Elber [Flores-Lopez] bring the pot up the stairs and into the conversion lab. We were able to confirm that there were multiple videos of that event happening inside of the house.

Id. at 31-32. Devogt provided the source with a photograph of Flores, and she

responded either, "yes, that's him" or "That's Mr. Edwin." Id. at 29-31.

### B.    Objections

#### 1.    Disclosure of Informant

Carreno "objects to the recommendation that his motion for disclosure of the

identity of the Source of Information who was interviewed on August 8, 2021 (sic)

be denied." Carreno's Objs. at 1-2. This was not a recommendation but a final

order on a pre-trial non-dispositive discovery motion by Judge Anand. A

magistrate judge is permitted to hear and determine any non-dispositive pretrial

matter pending before the court, including discovery matters, and the decision of

the magistrate judge is a final decision.  28 U.S.C. § 636(b)(1)(A).  A district judge

may reconsider any pre-trial non-dispositive order by a magistrate judge only

where the objector can show the order is "clearly erroneous or contrary to law."

Id.  The standard for overturning a magistrate judge's non-dispositive order is "a

very difficult one to meet."  Faircloth v. Baden, No. 1:11–CV–86 WLS, 2-12 WL

3574353, at *1 (M.D. Ga. Aug. 16, 2012) (quoting Thornton v. Merchantile Stores

Co., 180 F.R.D. 437, 439 (M.D. Ala. 1998)); see also Graham v. Mukasey, 247

F.R.D. 205, 207 (D.D.C. 2008) (holding that magistrate judge's ruling in discovery

dispute "is entitled to great deference").  A magistrate judge's orders "should not

be disturbed absent a clear abuse of discretion that leaves the reviewing court with

the 'definite and firm conviction that a mistake has been committed.'"  Rowlin v.

Ala. Dep't of Pub. Safety, 200 F.R.D. 459, 460 (M.D. Ala. 2001).

Carreno's argument fails to show that Judge Anand abused his discretion in

denying his motion for disclosure of the unidentified source.  He asserts that the

source of information on August 8, 2019, "is in a unique position to provide

information and testimony that may help contradict potential testimony."

Carreno's Objs. at 2.  This Court's agrees with Judge Anand that Carreno failed to

sustain his burden under <u>Roviaro v. United States</u>, 353 U.S. 53 (1957), to establish

that the Government's privilege to withhold disclosure of the identity of the source

is overcome by Carreno's right to prepare his defense.  As stated by Judge Anand:

> Although the Government has not identified this person, Agent Devogt has otherwise described her, explained her relationship with Defendant Flores and others, and the fact that she was present within the Bramlett Court residence (and captured on the Night Owl video images) at various times during the timeframe of the investigation.
>
> The Government asserts, and Defendant[] offers no allegations to refute, that the individual was uninvolved with any drug trafficking activity and instead was a mere witness or tipster present to observe certain activity. Defendant also provides no explanation as to why this individual's information would be helpful to his defense.  His initial brief fails to address this source's statement in particular, and only conclusorily states that all of the sources' "testimony may serve to amplify or contradict the testimony of law enforcement offices or other witnesses concerning his involvement in the alleged offense conduct."  Defendant also failed to respond to the Government's opposition to provide any further explanation.  Finally, the Government states that this source has provided ongoing information and exposure may expose the witness to harm, especially considering that at least one named defendant and potentially other co-conspirators remain at large.

R&R at 12-13 (internal citations omitted).  Carreno's objection to the pre-

dispositive order of the Judge Anand is **OVERRULED**.

2.      **The Search of the Residence**

a.      **Whether the Warrant Was Supported by Probable Cause**

Both Carreno and Flores contend that the applications for the April 23, 2019, search warrant for the Residence failed to establish probable cause to search the premises because there was no indicia of HM's or JP's reliability.[1]  Carreno's Objs. at 2-4; Flores's Objs. at 1-7.

The Fourth Amendment provides the right to be free of unreasonable searches and seizures, and mandates "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.  "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).  The task of a judge issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence

---

[1] The Court notes that Flores spends a large portion of his objections critiquing the Government's brief below which cited United States v. Foree, 43 F.3d 1572 (11th Cir. 1995).  Flores's Objs. at 3-5.  However, Foree was not cited by Judge Anand in support of his recommendation as to probable cause for the search warrant for the Residence.

of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a 'substantial basis . . . for conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238–39 (1983) (citation omitted). In cases involving hearsay information, the magistrate judge must examine the "veracity" and "basis of knowledge" of the person supplying the information. Id. at 238. Furthermore, probable case "is a fluid concept – turning on the assessment of probabilities in particular factual contexts." Brundidge, 170 F.3d at 1352 (quotation and citation omitted). "[W]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). The magistrate judge may also rely upon the opinions and conclusions of an experienced law enforcement officer-affiant. United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995).

The Court finds that the affidavit in support of the search warrant for the Residence provided the magistrate judge who signed the warrant with a substantial basis for concluding that probable cause was established for the search. First, the arrest of HM on January 25, 2019, led to the seizure of heroin and cocaine in a metal container. During a post-arrest interview, HM permitted agents to review messages on his cell phone which mentioned the Residence which HM identified

as a location where he delivered metal cylinders.  Nearly three months later, in a

separate narcotics investigation, JP was arrested in Raleigh, North Carolina, and

admitted driving to the Residence earlier that day to obtain narcotics and leaving

his car parked there.  Agents who surveilled the Residence confirmed that JP's car

was parked as described.  At that point, two separate individuals arrested for

possession of narcotics confirmed the Residence as a location where narcotics were

obtained, and there was confirmation of an important fact (JP's car parked at the

Residence) to indicate reliability.  Although the affidavit does not offer evidence of

the two arrestees' history of reliability, that history is not required if there is other

evidence under the totality of the circumstances to support a probable cause

finding.  In fact, "even if we entertain some doubt as to an informant's motives, his

explicit and detailed description of alleged wrongdoing, along with a statement that

the event was observed firsthand, entitles his tip to greater weight than might

otherwise be the case."  Gates, 462 U.S. at 234.  Moreover, the facts that two

separate individuals identified the Residence as a location for drug activity months

apart bolsters the probable cause determination.  Based upon the nature of the

criminal activity related by both arrestees, there was a fair probability that evidence

of illegal drug activity would be found at the Residence.

Because the warrant was supported by probable cause, Carreno's and Flores's objections are **OVERRULED**.

### b.      Whether the Good Faith Exception Applies

Both Carreno and Flores object to the Magistrate Judge's alternative ruling that, "[a]t a bare minimum, the warrant application was not so lacking in factual support as to deprive the officers of any good faith basis to rely on the warrant." Carreno's Objs. at 4-5; Flores's Objs. at 7-8. See R&R at 15-16.

As stated in United States v. Leon, 468 U.S. 897, 920-21 (1984), the Supreme Court has established a "good faith" exception to the exclusionary rule to prevent suppression of the items found pursuant to a search warrant when law enforcement officers obtain evidence through objective good-faith reliance on a facially valid warrant that is later found to lack probable cause. Leon's good-faith exception does not apply to any of the following four situations:  (1) where the magistrate issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant

is so facially deficient – *i.e.,* in failing to particularize the place to be searched or

the things to be seized – that the executing officers cannot reasonably presume it to

be valid.  Id. at 923; see also United States v. Robinson, 336 F.3d 1293, 1297 (11th

Cir. 2003) (concluding that although the Government bears the burden of

demonstrating the applicability of the good faith exception under Leon, "we

discern no reason why that burden cannot be met by reference to facts stated within

the affidavit.").

Carreno and Flores contend that this case falls within the third exception to

Leon because the affidavit lacks support for a determination that evidence of a

drug activity was occurring at the Residence.  In order to determine whether the

affidavit is so lacking in indicia of probable cause, "we look to the face of the

particular affidavit at hand in order to determine whether the warrant is so devoid

of probable cause that [the officers'] belief in its validity at the time it was issued

was entirely unreasonable."  United States v. Martin, 297 F.3d 1308, 1313 (11th

Cir. 2002).  However, for the reasons discussed in the preceding subsection of this

Order, the supporting affidavit was not so lacking in indicia of probable cause to

render official belief in its existence entirely unreasonable.  The affidavit

established a link between the residence and the criminal activity.  The affidavit

also contained sufficient information to establish a likelihood that that evidence

sought would be found in the place to be searched. Consequently, the Court finds that the affidavit contains enough indicia of probable cause that reliance upon the warrant was not entirely unreasonable.

Therefore, Defendants' objections to the applicability of the good faith exception are **OVERRULED**.

### 3.    Searches of Cellular Telephones

During the search of Carreno's car shortly before his arrest on April 25, 2019, two cellular phones were found which were subsequently searched pursuant to a warrant ("SW 2"). Carreno moved to suppress the information obtained from the cellular phones because the facts supporting the affidavit for SW 2 were linked to the legality of the search of the Residence pursuant to SW 1, which Carreno contends was not based on probable cause. Carreno's Mot. To Suppress Evidence Obtained Through Searches of Two Cellular Telephone[s] [Doc. 97] at 2, 8-9 (citing Wong Sun v. United States, 371 U.S. 471 (1963)). Because there was no infirmity in the underlying warrant for the Residence (SW 1), and Carreno alleges no other basis to challenge SW 2, Judge Anand recommends that the motion be denied. R&R at 16-17. This Court also finds that SW 1 was supported by probable cause, consequently, Carreno's objection to the information obtained from the execution of SW 2 is **OVERRULED**.

4.      **Search of White Van**

Carreno asserts that he was detained or arrested when he was removed from the white van and there was no reasonable basis to suspect that he was involved in the illegal drug activity at the Residence, so the observation of the glass pipe and the items seized from inside the van, including the cellular phones, was fruit of an unlawful seizure.  Carreno's Objs. at 8-9.

The police "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000); see also Terry v. Ohio, 392 U.S. 1, 30-31 (1968).

> Reasonable suspicion demands "considerably less" than probable cause, but "the police are required to articulate some minimal, objective justification for the stop." United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996).  That justification may be based on the information available to the officer at the time.  See [United States v.] Arvizu, [534 U.S. 266,] 273 [(2002)].

United States v. Webster, 314 F. App'x 226, 229 (11th Cir. 2008) (parallel citations omitted).

To determine whether reasonable suspicion exists, the court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."

18

Arvisu, 534 U.S. at 273.  Examining the totality of the circumstances "allows

officers to draw on their own experience and specialized training to make

inferences from and deductions about the cumulative information available to them

that might well elude an untrained person."  Id. at 273 (quotation and citation

omitted).  The Court will give due weight to an officer's experience and expertise

when evaluating reasonable suspicion.  Ornelas v. United States, 517 U.S. 690, 699

(1996); see also United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir.

2000) ("[g]reat deference is given to the judgment of trained law enforcement

officers on the scene.") (internal quotation marks and citation omitted).

The Court agrees with Judge Anand that "Officer Smith possessed

reasonable suspicion to justify an investigative seizure."  R&R at 19.  At the time

Carreno was detained after exiting the white van, Smith and other DEA agents

knew:  (1) HM and JP delivered or obtained illegal drugs from the Residence;

(2) a white van matching a description of the one driven by Carreno was observed

at the Residence; (3) a search of the Residence uncovered a production lab and

distribution site for methamphetamine, as well as drugs, weapons, and other tools

of the drug trade; (4) Terrero was the mother of the child present at the Residence

during the search; (5) Terrero has been living at the residence, had been involved

with drugs, and had a new boyfriend; and (6) Carreno drove Terrero to the DFACS

office to meet about her child.  At the time Carreno pulled up in the white van to the DFACS office, agents had a reasonable suspicion that the individual who drove Terrero to the DFACS office could have been involved in the drug conspiracy and could therefore detain him for questioning.

In addition, a warrantless search of an automobile is constitutional if (1) the automobile is readily mobile and (2) there is probable cause to believe that it contains contraband or evidence of a crime.  United States v. Lanzon, 639 F.3d 1293, 1299-1300 (11th Cir. 2011) (citing United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003)).  The first prong is satisfied if the car is operational.  Watts, 329 F.3d at 1286 (citation omitted).  Regarding the second prong, probable cause "exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." Lanzon, 639 F.3d at 1300.  Carreno does not challenge Judge Anand's finding that the automobile exception applies to justify a search of the white van after Smith observed a glass pipe likely used for methamphetamine or crack cocaine in plain view in the console area of the vehicle.

For these reasons, Carreno's objections to his detention by officers, and the resultant search of the white van, are **OVERRULED**.

5.     **Video Surveillance**

Carreno moved to suppress evidence obtained from a pole camera that was installed in a public location on or about February 26, 2019, within view of the front of the Residence.  R&R at 22-23 (citing Carreno's Mot. to Suppress Evidence From Warrantless Pole Camera Surveillance [Doc. 112] and Gov't's Mot. for a Prelim. Ruling on Def.'s Mot. to Suppress Pole Camera Surveillance [Doc. 118]). Judge Anand noted that Carreno did not respond to the Government's motion to dismiss his motion to suppress nor raise any argument with respect to the pole camera surveillance at the evidentiary hearing.  R&R at 23.  Carreno now objects to Judge Anand determining that "this is not a case to which the precedent of United States v. Carpenter, 138 S. Ct. 2206 (2018), could be extended."  Carreno's Objs. at 10.

Carpenter concerned the Government's acquisition from a wireless carrier of cell-site location information revealing the location of the defendant's cell phone whenever calls were made or received.  Carpenter, 138 S. Ct. at 2214.  The Supreme Court held that the Government's acquisition of cell-site location information constitutes a search that requires a warrant.  Id. at 2217, 2223.  The Court limited its holding to "the unique nature of cell phone location records,"  and noted that "the time-stamped date provides an intimate window into a person's life,

21

revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." Id. at 2217.

The images of a single, fixed location captured by the pole camera in this case do not equate with the activities revealed by cell-site location information considered by the Court in Carpenter. The Supreme Court in Carpenter made that distinction clear: "We do not . . . call into question conventional surveillance techniques and tools, such as security cameras." Id. at 2220. Consequently, Judge Anand did not err by refusing to extend Carpenter to apply to the images produced by the pole camera in this case. Carreno's objection is, therefore, **OVERRULED**.

### 6.    Identification Testimony

Flores contends that Judge Anand erred by failing to recommend the suppression of the identification of Flores in a photograph by JP on May 8, 2019, and in video images on May 30, 2019, and in a photograph by the female source of information on August 8, 2019. Flores's Objs. at 8-15. Carreno objects to Judge Anand's determination that the identification of Carreno in video images presented by Devogt to JP on May 30, 2019, was reliable. Careno's Objs. at 10-12.

In order to succeed on their motions to suppress the identification evidence, Defendants must show that (1) the law enforcement's identification procedure was unduly suggestive, and (2) that the identification under the totality of

circumstances was not reliable.  Blanco v. Singletary, 943 F.2d 1477, 1508 (11th

Cir. 1991) (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).

> In assessing the constitutionality of a district court's decision to admit an out-of-court identification, we apply a two-step process. United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001). We first examine whether the identification procedure was unduly suggestive. Id.  A pretrial identification procedure is impermissibly suggestive "when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of the crime." [United States v.] Elliot, 732 F.3d [1307,] 1309-10 [(11th Cir. 2013)]. Where no improper police conduct exists, exclusion of the out-of-court identification is unnecessary. Id. at 1310.
>
> If we conclude, however, that the identification procedure was unduly suggestive, we then consider whether—given the totality of the circumstances—the identification was reliable nonetheless. Diaz, 248 F.3d at 1102.  Under this second step, we consider five factors in determining the reliability of a witness's identification: opportunity to view, degree of attention, accuracy of the description, level of certainty, and length of time between the crime and the identification.  Neil v. Biggers, 409 U.S. 188, [198] (1972).

United States v. Williams, 688 F. App'x 895, 896-97 (11th Cir. 2017) (parallel

citations omitted).   While it is true that courts have concluded that showing a

witness only one photograph is unduly suggestive, Manson v. Brathwaite, 432 U.S.

98, 108-09 (1977); United States v. Cannington, 729 F.2d 702, 711 (11th Cir.

1984), courts still proceed to analyze whether the totality of the circumstances

establish reliability to determine whether the evidence should be suppressed.  See,

e.g., United States v. Walls, 237 F. App'x 599, 601 (11th Cir. 2007) (assuming,

without deciding, that the use of single photograph was unduly suggestive, but
nevertheless denying suppression because the evidence demonstrated that the
identification was reliable).

With respect to JP's identification of Flores and Carreno, Judge Anand
concluded that the procedures used to obtain identifications were not unduly
suggestive. R&R at 29. This Court agrees. On May 8, 2019, JP identified the
same photograph of Flores that he himself provided to agents after his arrest. On
May 30, 2019, JP identified Carreno and Flores from viewing the "Night Owl"
surveillance videos taken during the search of the Residence. Neither of these
procedures were unduly suggestive. Even if they were, given the totality of the
circumstances, JP's identifications were reliable because of JP's personal
knowledge of the Residence, the use of the meth lab, and the persons who operated
there. The video footage was made only 10 to 15 days prior to the execution of the
search warrant on April 25, 2019, which was only two weeks prior to JP's arrest
and about 45 days prior to JP's viewing of the video, so the length of time between
the crime and the identification was short.

As Judge Anand also stated, the identification of Carreno by the female
confidential source presents a much closer issue. Because the source identified
only a single photograph of Flores with a response, "yes, that's him" or "That's

24

Mr. Edwin," Judge Anand found that "[t]his procedure ran the risk of leading the witness to identify the suspect under investigation.  The Court has little hesitation in labeling this disfavored approach as unduly suggestive."  R&R at 29.  This Court agrees.  With respect to whether the totality of the circumstances nevertheless established reliability, Judge Anand opined as follows:

> This identification also occurred several months after any activity in 1917 Bramlett Court and the Government elicited no evidence as to any ongoing further contact after the execution of the search warrant between this witness and Movant (Defendant Flores).  Further, while the agent testified that the witness "had intimate knowledge of [Defendant Elber Flores-Lopez]," Tr. [133] at 31, there was no evidence elicited of any specific relationship with the Movant.  That the Government, which has the burden of proof on the issue of reliability under the second prong of Biggers, declined to identify the witness also weighs against a finding of reliability.

> On the other hand, Agent Devogt's testimony explained specific facts as to the witness's basis for knowing Defendant Flores's identity and the witness's knowledge of details of the individuals associated with 1917 Bramlett Court.  This was far from the fleeting recollection of a victim or passerby otherwise unfamiliar with the suspects.  The evidence showed that the source was personally and significantly familiar with the occupants of 1917 Bramlett Court.  See Tr. [133] at 29-31 ("The source would often visit the house . . . She was able to provide Facebook accounts, pictures of the subjects, or I'm sorry, of the defendants. Overall, she said that they were friends and that she had known them, I believe, since approximately January, maybe February of 2019.").

> The investigators could corroborate the witness's basis of knowledge, as the Night Owl surveillance footage apparently showed her to be present.  The witness was also able to explain the activity within the house and the participants' various roles.  Id. at 31 ("She was able to

describe everybody who was previously mentioned, where they stayed in the house, their roles. She was able to provide phone numbers for the individuals inside the house. She showed -- she had intimate knowledge of Mr. Elber and I believe it was Mr. Edwin's mother, stated they had met, they had been friendly. So the -- the source had -- she was friendly with them. She had a lot of information about the drug activity in the house, along with their personal life, sir.") Finally, the witness was "very positive" in her identification of Movant. Id. at 31 ("she didn't delay, she didn't have to think about it.")

In the end, while the agents could have used a less suggestive procedure, the totality of the evidence in the record contains sufficient indicia of reliability to avoid a constitutional issue as to the August 8, 2019 identification.

R&R at 30-31.

After considering the five Biggers factors in determining the reliability of the female sources' identification (opportunity to view, degree of attention, accuracy of the description, level of certainty, and length of time between the crime and the identification), the Court concurs with Judge Anand's analysis.

Accordingly, Flores's and Correno's objection to Judge Anand's recommendation as to out-of-court identifications made by JP and the confidential female source are **OVERRULED**.

## III.   CONCLUSION

Accordingly, after a *de novo* review of those portions of the R&R to which Defendants object, the Court **OVERRULES** their objections [Docs. 163, 164].

Finding no clear error in the remaining portions of the R&R, the Court **ADOPTS** the R&R [Doc. 157] as the Opinion and Order of the Court.

It is hereby **ORDERED** that the following Motions are **DENIED**: Defendant Carreno's Motion to Suppress Evidence [Doc. 59], Preliminary Second Motion to Suppress Evidence [Doc. 84], Motion to Suppress Evidence Obtained Through Execution of Search Warrant [Doc. 90], Motion to Suppress Evidence Obtained Through Searches of Two Cellular Telephones [Doc. 97], Preliminary Motion to Suppress Identification Testimony [Doc. 98], and Motion to Suppress Evidence Obtained From Warrantless Pole Camera Surveillance [Doc. 112]; and Defendant Flores's Motion to Suppress Evidence Seized Pursuant to Search Warrant [Doc. 105], Amended Motion to Suppress Evidence Seized Pursuant to Search Warrant [Doc. 107], and Motion to Suppress Identification [Doc. 109].

It is further **ORDERED** that the United States' Motion for a Preliminary Ruling on Defendant's Motion to Suppress Pole Camera Surveillance [Doc. 118] is **DENIED AS MOOT**.

It is further **ORDERED** that the time between the date the Magistrate Judge certified Defendants Carreno and Flores as ready for trial on February 5, 2021, and the issuance of this Order, shall be excluded in calculating the date on which the trial of this case must commence under the Speedy Trial Act because the Court

finds that the delay is for good cause, and the interests of justice in considering

Defendants' objections to the Report and Recommendation outweigh the right of

the public and the right of the Defendant to a speedy trial, pursuant to 18 U.S.C.

§ 3161, *et seq*.

      **IT IS SO ORDERED** this 8th day of April, 2021.


_____
MARK H. COHEN
United States District Judge